**Margaret Beckwith, by Myrtle Beckwith, Appellee, v. Lloyd V. Boynton et al., Appellants.**

**Gen. No. 7,745.**

1. NEGLIGENCE—*when presumed.* Negligence may be presumed when a thing which has caused an injury is shown to be under the management of the party charged with negligence and the accident is such as in the ordinary course of things will not happen if those who have such management use proper care.

2. EVIDENCE—*inadmissibility of conclusions of witness.* In an action for malpractice in which it was charged that defendants, in some manner, caused an injury to the vertebrae of plaintiff's neck while removing her tonsils, the testimony of plaintiff's father that when he entered the operating room plaintiff's "head was off the end of the table as far back, it looked to me, as it possibly could be gotten" was a mere conclusion and should have been stricken out.

3. MEDICINE AND SURGERY—*application of rule of res ipsa loquitur in malpractice case.* In an action for malpractice alleged to have caused a misplacement of vertebrae in plaintiff's neck while defendants were operating upon plaintiff by removing her tonsils, where no testimony was offered tending to show negligence or the lack of the highest skill in the performance of the operation, the case is not one where the rule of *res ipsa loquitur* will apply.

4. MEDICINE AND SURGERY—*when verdict should have been directed for defendants in malpractice case.* Where no evidence was

introduced in an action for malpractice showing that anything was done by defendants while they were doing a tonsillectomy operation that would cause the alleged misplacement of vertebrae in plaintiff's neck and the circumstances were not such as to make the doctrine of *res ipsa loquitur* applicable, while defendants' evidence, given by experts, tended to show that the case was one which was caused by infantile paralysis and threw doubt upon whether there was in fact a dislocation as claimed, the court should have directed a verdict for defendants.

5. MEDICINE AND SURGERY—*when joint tort liability not shown in malpractice case.* In an action against several physicians for malpractice because of an alleged injury to the vertebrae of plaintiff's neck during an operation for the removal of her tonsils, where there was no question of partnership or of employment between the various defendants and no joint act of negligence was committed, while one of defendants was merely the family physician who received no fee for the operation but as an act of kindness called up the other defendants, arranged the date at the hospital and went with the family and rendered them all the assistance that he could, and nothing in the record warranted him being subjected to damages, there was no joint liability.

6. WITNESSES—*admissibility of evidence as to telephone conversations to impeach witness.* In an action for malpractice where, in three instances, witnesses who heard plaintiff speaking over the telephone a week after the operation recognized and identified her voice and offered to testify that they heard her state that she was getting along nicely from the operation, upon which the action was based, which testimony would have directly contradicted plaintiff's testimony, it was error to reject such testimony.

Appeal by defendants from the Circuit Court of Fulton county; the Hon. WALTER C. FRANK, Judge, presiding. Heard in this court at the April term, 1924. Reversed with finding of facts. Opinion filed December 31, 1924.

ATHERTON & RATCLIFF and JOHN M. ELLIOTT, for appellants; HENDRIK FOLONIE and EDWARD W. RAWLINS, of counsel.

WILLIAM PRENTISS, BURNETT M. CHIPERFIELD and CLAUDE E. CHIPERFIELD, for appellee.

MR. PRESIDING JUSTICE SHURTLEFF delivered the opinion of the court.

This is an action on the case, brought by appellee through her next friend, to recover alleged damages claimed to have been sustained by appellee as a result of a surgical operation for the removal of tonsils performed upon her on September 13, 1921. At the time of the operation appellee was fifteen years of age, living with her parents.

There were four counts in the declaration. In substance the said counts charged that the appellants, while exercising the profession of physicians and surgeons, were employed by appellee through her father to perform an operation upon her for the removal of tonsils, etc., and that said appellants accepted such employment and on or about the 13th day of September, 1921, the appellants operated upon appellee for such purpose and that the appellants did not treat appellee with ordinary care and skill, but, as alleged in the first count: "but so unskillfully and negligently conducted themselves in that behalf that by and through their want of ordinary care and skill did so improperly handle and manipulate the body of the plaintiff, in some manner unknown to the plaintiff, after having made her unconscious by the administration of an anaesthetic, that the neck, spine and vertebrae of the said plaintiff was injured, dislocated," etc., and in the second count: "acting jointly in the performance of said surgical operation, using great force and violence therefor, did improperly thrust back the head and neck of the said plaintiff with such force and violence and to such an extent and degree, that the muscles and ligaments of the neck of the said plaintiff were injured, torn and lacerated, and the back and vertebrae of the said plaintiff were dislocated, displaced, injured and fractured."

In the third count it is charged: "that during the course of said operation the neck and back of the said plaintiff was broken, injured and dislocated and certain vertebrae of the spine were fractured, dis-

placed and dislocated by the said defendants in some manner unknown to the plaintiff.''

And in the fourth count: ''it is charged that they did so rudely, roughly, carelessly and negligently handle and care for the said plaintiff, in some manner unknown to the plaintiff, that instead of relieving the plaintiff, they greatly increased and aggravated her physical condition,'' etc.

In all the counts it is charged that appellee was under the influence of an anaesthetic, administered by appellants, and unconscious during said operation and the performance of said negligent acts, and that by reason of the alleged want of skill and care appellee became and still is permanently injured. The second, third and fourth counts charge that the operation was performed jointly by appellants and all the counts charge the employment and lack of skill and care of appellants in the performance of said operation.

There were separate pleas of the general issue, and separate pleas denying joint employment and joint liability filed, a trial by jury and a verdict and judgment in appellee's behalf in the sum of $18,000. Appellants bring the case by appeal to this court for review.

The facts as shown by the testimony of appellee were substantially as follows: Appellee lived with her parents on a farm near the village of Vermont in Fulton county. She had attended school and assisted in the housework and had performed such duties as are usually performed by children of her age upon farms. During the winter of 1920 and the spring of 1921, appellee was ill and did not attend school after January 19, 1921, and was under the professional care of appellant Boynton and Dr. Adams, the latter advising her that she had a rheumatic affection and directed that she remain out of school. Appellant Boynton was called shortly after January 10 and ordered the plaintiff to bed. Appellee re-

mained in bed until about the 1st of March, 1921, after which she was up and around the house. Appellant Boynton informed appellee that the rheumatism had left some heart trouble and that she had a heart murmur. There is testimony by appellee that Dr. Adams advised her to have her tonsils removed, and he stated that if she had had her tonsils removed when this operation was performed for her sister, he did not think she would have had this trouble. It is not disputed by any of the testimony but that the tonsils of appellee were diseased.

Appellant Boynton was a general practitioner at Vermont and vicinity and for some years had been the family physician of the Beckwith family. Appellant Knappenberger was engaged in the general practice at Macomb and took part in the operation by administering the anaesthetic to the patient. Appellant Duntley, who performed the operation, was located at Bushnell, where he had been engaged in general practice of medicine and surgery and the appellants, defendants below, belonged to the regular school.

Appellee offered the testimony of her father, Henry Beckwith, who made the arrangements with reference to the operation. He testified that appellant Boynton had advised the operation and had suggested that appellant Duntley perform the operation. The witness testified that appellant Boynton said he would look after her. He said he would "have to have assistance and that Dr. Duntley was the best he knew of in the state" and he said the best anaesthetic man he knew of was Dr. George Knappenberger of Macomb. The witness Beckwith testified that he stated to appellant Boynton that if they were the best they were the ones he wanted. Beckwith testified: "I said I knew Dr. Duntley very slightly. I did not know Dr. Knappenberger then. I knew Dr. Duntley as operating one time on my other little girl. He had removed her tonsils. I was slightly acquainted with him."

Apparently appellant Boynton called up appellants Duntley and Knappenberger and made the arrangements for the operation in the hospital at Macomb, in which Dr. Adams had an interest and who was present at the operation. The morning of the operation the father, Henry Beckwith, met appellants Duntley and Knappenberger at the hospital before the operation and talked with them. Witness Beckwith states: "I asked Knappenberger and Duntley to look after the girl and see that she was all right, and they promised me they would, both of them."

The operation was performed by appellant Duntley. Appellant Knappenberger administered the anaesthetic, sitting at the head of the operating table, his body coming within three or four inches from the table and bending over the head of appellee. Appellant Boynton was present during the operation, in which he took no part, except occasionally to take appellee's pulse. Dr. Adams was present but took no part in the operation. Two nurses and a student nurse connected with the hospital were present at the operation, as well as appellee's mother and Elizabeth K. Seaburn, a registered nurse and a second cousin of appellee, who had gone with the appellee to be present at the operation and assist her thereafter. The father, Henry Beckwith, did not go into the operating room when appellee was carried or repaired to the operating table. He testified that he left the hospital but returned about fifteen minutes before the operation was completed and entered the operating room, standing for a minute or two about ten or twelve feet from appellee, then lying upon the operating table. The father testifies: "My attention was called. I went in the operating room and saw Margaret. She was lying on the operating table; the head was off the end of the table as far back, it looked to me, as it possibly could be gotten." This statement was objected to and a motion made to strike as a mere conclusion, but the motion was overruled.

The witness Elizabeth K. Seaburn testified more particularly for appellee in this connection. She says: "Dr. Duntley was at the patient's left, operating. The chin was raised several inches from the position it would be in when she was lying flat on the table; would judge the operation took an hour; during the course of the operation the head was moved a little sideways, naturally as they were working. Dr. Duntley, the operator, moved the head and neck. During the time the operation was going on the head was not supported. Nothing was done towards supporting the back of her head and neck during that time. Dr. Duntley was performing the operation and Dr. Boynton was just at his left. Dr. Knappenberger was at the head, giving the ether. The pressure was applied to the head, that pushed it back by the operator, just in the operating; head was pushed back by Dr. Duntley. The one who gave the anaesthetic, of course, had it back and in him working it would gradually push the head back further. I don't know and couldn't state with what degree of force it was pushed back. I couldn't explain it. As I said, it was very far back, but as to just how far, whether it was to the limit or not, I couldn't say positively. I don't know whether it is possible to thrust it back any further or not. Her body was lying flat upon the table at that time; her head was thrust back; her chin was elevated at that time, to quite an elevation; would say several inches; more than two or three, would be several inches. She made a sound toward the latter part; it was an exclamation of pain or a smothered scream. Her head and neck were then quite far back, several inches; following the scream her father came into the room. I am not sure whether her head was off the table or not; it is my recollection the body remained in the same position upon the table, upon her back, during the course of the operation, from the beginning to the finish of it and was not moved

but merely the mouth opened, the chin elevated some-
what, as the mouth was opened, and the back upon the
end of the table, the top part of the table. I do not
remember any support under Margaret's head as she
lay on the table; I have reference to a pillow or sand-
bag.''

There was testimony that a gag was placed in the
mouth, between the teeth, to keep the mouth open, and
at times appellant Knappenberger would take hold of
this to hold the head quiet and stationary. Outside
of the testimony of Miss Seaburn and Henry Beck-
with, as cited, nothing was shown in the performance
of the operation by appellants but that it was per-
formed with the highest skill and the utmost care and
caution, and in the regular scientific manner in which
such operations should be performed by surgeons,
properly qualified to perform such work. Appellee
produced no testimony or evidence as to negligence
or want of care or skill, on the part of the appellants,
except as set out, *supra*. The only medical testimony
offered by appellee was given by Dr. Paul S. Scholes,
who was permitted to testify, over the objection of
appellants, that the extension of the head, as related
to tonsillectomy, is not a part of the operation; that
whatever extension is made on the head is for the
purpose of promoting easier breathing while the per-
son is taking the anaesthetic; that it is not customary
to damage the spine by the extension in any opera-
tion; it is not customary to extend the head to the
extent of injuring the spine and that the custom is ''to
do no harm''—''emphasizes that point''—''to do no
harm in this operation or any other operation.'' Dr.
Scholes further testified that he had never heard of
a case in which damage was done to a vertebrae in
a tonsil operation. Much of this witness' testimony
was incompetent. Appellee offered testimony tend-
ing to show that soon after the operation she could
not control the operation of her head and neck; that

always prior to the operation appellee had had perfect control of her head and neck; that after the anaesthetic had passed off, after the operation, appellee had observed pain and discomfort in her neck. "It seemed to be in the back and front part of the neck; it felt as though it was tight and pushed and the front part of the neck felt so tight and sore, as though it were pushed together; that when I came out from the anaesthetic I observed that I was unable to rotate my head or lift it, I mean turn it from side to side. I cannot move it backward or forward."

Appellee, after the operation, remained at the hospital for two days and then rode in an automobile to her grandmother's, who resided in Macomb, where she remained two days and was then driven to her home, in an automobile, about fifteen miles from Macomb. Appellee testifies that she rode in the front seat with her father and supported her head with her left hand. Following the operation, appellee testifies that she had trouble with her right eye and that it became paralyzed; that the right side of her face became paralyzed and the right eye was paralyzed; that she could not move the lid and that the right corner of her mouth drooped and she had no expression on that side of her face; that it was so affected from the eye down as far as the edge of the mouth, and that appellee's left arm was paralyzed, at first, the entire arm and she could not move it at all. Afterwards the arm got so she could move it backward and forward but could not raise it. This condition of the arm developed a few days after the operation. Appellee states that some of this condition of paralysis has remained permanently, but is not as aggravated as in the beginning. Appellee was examined by appellant Boynton and by Dr. Adams a few days after the operation. On November 8, 1921, appellee was examined by Dr. W. M. Hartman of Macomb, who took X-ray pictures of the cervical vertebrae in the region

of the neck, anterior, posterior and lateral, and testified that the plates had been turned over to appellee's father, none of which were offered in evidence or accounted for by appellee. Appellee was examined by Dr. Ralph Welch, an osteopath of Macomb, on February 20, 1922, who testified to finding a dislocation between the second and third cervical vertebrae. Dr. Welch states that it was a rotation of the second upon the third vertebrae and that the distance would be about three-eighths of an inch—he could not state exactly; that it was twisted part way around and locked in that position so that it could not come back to normal condition. Dr. Welch further testifies that there was very little displacement forward and backward, and that it would affect the position of the muscles attached to the spinous process. He further stated that the condition was not necessarily permanent, and that it might be set the same as any other dislocated joint.

On March 6, 1922, appellee was taken to Dr. John L. Porter, who testified to his examination of appellee and found that she had some inability of movement of the upper part of the spine, some limitation of motion and that it was impossible for her to twist her head in both directions normally, and that one spinous process was slightly deviated from the median line. Dr. Porter treated appellee orthopedically. After traction had been applied, the head was carefully rotated into normal position and plaster paris casts put on from the top of the head to the chest. As to the spine, Dr. Porter testified there was a deviation from the normal position; that normally the spinous process sticks out backwards from the spine, one right above the other; that you can feel them as you run your fingers down the back, and as he passed his fingers down the patient's back he found one of those spinous processes a little to one side of the median line; that it was impossible to state how far, "perhaps three-

sixteenths or a quarter of an inch.'' In July, 1922, Dr. Porter advised taking off the plaster paris casts and putting on a rigid collar, reaching from the head to the waist. This was done by Dr. Taylor, and appellee was wearing the rigid collar at the time of the trial. Appellee's father paid Dr. Duntley for his services on the day the operation was performed. He also paid the hospital bill, which included the charge of Dr. Knappenberger at about the same time. There is no testimony that indicates Dr. Boynton ever rendered any bill or that any charge was paid to him, at any time, and, in fact, further than is set out in this opinion there is no testimony tending to show that appellant Boynton ever expected any pay for his part in this operation.

No testimony was offered by appellee of any kind as to the method, custom, practice or usual manner of conducting the operation for tonsillectomy, except the statement of Dr. Scholes that a traumatic injury does not usually follow or result, which in effect means that such an operation is practice. No testimony of any kind was offered by appellee showing or tending to show that the misplaced or rotated cervical vertebrae, as claimed by the witnesses, and the condition of paralysis, might or could have been caused by any act or omission of the appellants, unless it may have been caused by appellee's head being permitted to hang down over the end of the operating table, if there is any testimony tending to show that the head was placed in that position. In January, 1922, appellee suffered severely from the whooping cough, as shown by the testimony.

At the close of appellee's case and again at the close of all the testimony, appellants, by a motion and each by separate motions and instructions, asked the court to instruct the jury to find for the defendants. The court refused all of these motions and it is assigned as error by each appellant and by all of them.

Appellee contends, and refers to her declaration, that this is not an ordinary suit for malpractice where it is claimed that the injury to appellee resulted from an improper course of treatment, contrary to the teachings or principle of some certain school of medicine, but insists, as set out in her declaration, that the injury sustained by her was brought about and occasioned by the wrongful, careless and improper handling and manipulation of appellee's body during the operation for removal of tonsils, which resulted in a dislocation or fracture of one of the cervical vertebrae, resulting in injury, and appellee contends that the doctrine of *res ipsa loquitur* applies in this case.

In so far as the allegations in the declaration are concerned, it may be conceded that the first, third and fourth counts of the declaration are sufficiently general under which the doctrine of presumed negligence might be applied in a proper case. *Feldman v. Chicago Rys. Co.*, 289 Ill. 34. Negligence may be presumed when a thing which has caused an injury is shown to be under the management of the party charged with negligence, and the accident is such as in the ordinary course of things will not happen, if those who have such management use proper care. In such cases, the accident itself affords reasonable evidence, in the absence of an explanation by the parties charged, that it arose from the want of proper care. *Feldman v. Chicago Rys. Co., supra; O'Callaghan v. Dellwood Park Co.*, 242 Ill. 345; *Chicago Union Traction Co. v. Giese*, 229 Ill. 263.

In another class of cases it is held that where the condition can be accounted for as readily on the hypothesis of pure accident and absence of negligence as upon the ground of negligence, and where nothing is done out of the usual course of business, unless that course itself is improper, negligence cannot be presumed. *Chicago & E. I. R. Co. v. Reilly*, 212 Ill. 512; *Vandenburgh v. Chicago & N. W. R. Co.*, 174

Ill. App. 225; *Baliutis v. Hammond Co.*, 170 Ill. App. 598; *Graiziger v. Henssler*, 229 Ill. App. 374; *Sims v. Parker*, 41 Ill. App. 284. We have examined all of the cases cited by appellee. *Vischer v. Northwestern El. R. Co.*, 256 Ill. 572, merely states the rule as laid down in *Feldman v. Chicago Rys. Co.*, *supra*, and the other cases cited. In *Sweeney v. Erving*, 228 U. S. 233 (57 L. Ed. 817), plaintiff proved that the injury was an X-ray burn, traceable directly to the defendant's operation, and in *Benson v. Dean*, 232 N. Y. 52, 133 N. E. 127, in which a surgeon, in performing an operation, broke a needle, a portion of which remained in the body of the patient for several months, causing an abscess and much pain and suffering until removed, it was held that it might be some evidence of negligence, but that when plaintiff failed to offer any evidence to rebut defendant's evidence that surgical needles sometimes break, even when the operator uses the highest degree of skill and care, the possible inference of negligence from the breaking of the needle, alone, was driven out and the jury should have been so instructed. There is authority without question that in certain cases of malpractice the doctrine of presumed negligence may apply, but in all such cases it must be shown that the thing which caused the injury was under the management of the party charged with negligence, under the doctrine of the cases cited.

In many cases cited by counsel for appellants and appellee the facts are differentiated from the facts in this case. Appellee contends that the testimony in this case tends to show a traumatic blow or injury upon the body of appellee, disconnected with the actual performance of the operation. This is based upon the testimony of the father, Henry Beckwith, and Elizabeth K. Seaburn, all of which is cited *supra*. The statement of Henry Beckwith is a mere conclusion and should have been stricken out. The state-

ment is also inconsistent with the testimony that the body of Dr. Knappenberger was only three or four inches from the head of the operating table. From the entire testimony of Elizabeth K. Seaburn and the other testimony in the record, nothing is shown of a traumatic nature or inconsistent with due care and skill on the part of appellants. Eliminating from the record the statement of Henry Beckwith that, "the head was off the end of the table as far back, it looked to me, as it possibly could be gotten," this record is barren of any testimony tending to support the allegations of the declaration, and the case must be supported, if at all, by inference and presumed negligence. The statement of the witness Beckwith is not only a conclusion, but meaningless. It is true, there was testimony submitted tending to show that appellee had a sore neck and trouble with the motion of her head soon after the performance of the operation, followed within a week by paralysis of the face, in the muscles that control the eye and in the left arm. In December, 1921, and January, 1922, appellee had a severe attack of whooping cough, and on November 8, 1921, X-ray pictures were taken which are not in the record, and on February 20, 1922, Dr. Welch discovered a dislocation between the second and third cervical vertebrae. Again, on the same day, X-ray pictures were taken by Dr. Stannard, at the instance of appellee, but neither the jury nor this court are enlightened by any proofs of this kind. The testimony of Dr. Porter, who examined appellee in March, 1922, corroborates the testimony of Dr. Welch as to the dislocation of the cervical vertebrae. No testimony is offered by appellee even tending to show negligence or the lack of the highest skill in the performance of the operation. Plainly it is not such a case, under any definition we are able to find by the courts of this State, where the rule of *res ipsa loquitur* will apply, and there is in this record substantially no testimony

tending to support the allegations of the declaration. Appellee does not bring herself within the rule by showing that the "thing" which caused the injury was under the control of appellants. The conclusion arrived at is based entirely upon appellee's testimony in the case. It was held in *Miller v. Toles* [183 Mich. 252], 150 N. W. 118:

"In an action against a physician for malpractice in the treatment of plaintiff's limb, it is not sufficient for plaintiff to show the facts surrounding the injury to the limb, the subsequent treatment, and the ultimate loss of the limb, but there must be expert testimony tending to show malpractice, or the jury may not draw inferences of negligence of the surgeon."

And the same rule is laid down in *Sims v. Parker*, 41 Ill. App. 284; *McKee v. Allen*, 94 Ill. App. 147; *Moline v. Christie*, 180 Ill. App. 334; *Blodgett v. Nevius*, 189 Ill. App. 544; *Scully v. Hawkins*, 227 Ill. App. 610; *Dawson v. Allen*, 191 Ill. App. 399; *Graiziger v. Henssler*, 229 Ill. App. 365; *Royster v. Murdock*, 220 Ill. App. 662; and *Goodman v. Bigler*, 133 Ill. App. 301.

In the opinion of this court the jury should have been instructed to find a verdict for appellants. Upon reading all of the testimony offered by appellee and appellants, the conclusion arrived at is very much accentuated. Appellants offered the testimony of a considerable number of skilled physicians and surgeons, some of them of the highest repute in their profession in the State. All of them, to whom the facts and testimony as to the physical ailments of appellee were presented, pronounced it a case without question of infantile paralysis in some part, possibly induced by appellee's physical ailments existing prior to the operation and subject to being induced by other causes than the operation in question. This testimony was rebutted by appellee by only one witness, a lady, who was licensed in Illinois to practice medicine in 1890 and who had practiced her profession until 1895, after

which she seems to have followed other pursuits until 1912, when she took up chiropractics and attended a school for a few months, since which time the witness had practiced chiropractics at Bushnell and Macomb, in this State, and had had three cases of infantile paralysis.

Appellants' testimony, a part of which was uncontradicted, tended to show that a dislocation. of the second upon the third cervical vertebrae, by a rotation putting the spinous process about one-fourth to three-eighths of an inch out of line, caused by an injury, would result in the immediate death of the patient or the head would be held firmly in an abnormal position and permanently until the dislocation was relieved.

It was further shown by appellants' witnesses that the apparent dislocation of the cervical vertebrae was not a dislocation of the vertebrae at all, but that the muscles on one side of the spinous column being paralyzed and not paralyzed on the other side, there was a tendency on the part of the active muscles to draw from the opposite side and present a case of apparent displacement.

Appellants insist there was no joint liability between them in this case. There was no question of partnership or of employment between the various defendants, neither was any joint act of negligence committed. *Brown v. Bennett*, 157 Mich. 654, 122 N. W. 305; *Mayer v. Hipke*, 183 Wis. 382, 197 N. W. 333. In *Brown v. Bennett, supra*, it was held:

"It is the not uncommon case of a practicing physician advising a patient to submit to a surgical operation to be performed, not by himself, but by some surgeon of reputation, skill and experience, for which operation, with the consent of his patient, he makes the necessary arrangements, in performing which he assists the operating surgeon as directed or advised. The operation was not performed by these defendants jointly. Dr. Smith performed it, as his own testi-

mony and that of each of the physicians and of the nurse conclusively shows. In accordance with modern methods, the operation was an organized performance. Dr. Crosby administered the anaesthetic. That was his duty and responsibility. Drs. Bennett and Ransom assisted the operating surgeon.  *  *  * They helped in regard to sponging up blood, and perhaps occasionally caught a spurting vessel when it was cut.  *  *  *  The nurse had charge of the sponges before and after they were used, and counted them before and after the operation. That was her duty."

To sustain joint liability appellants cite: *Harris v. Fall,* 177 Fed. 79, 27 L. R. A. (N. S.) 1174; *Haase v. Morton & Morton,* 138 Iowa 205, 115 N. W. 921, and *Moehlenbrock v. Parke, Davis & Co.,* 145 Minn. 100, 176 N. W. 169.

In *Morey v. Thybo,* 199 Fed. 762, citing *Harris v. Fall, supra,* the question arose as to the relation between a surgeon operating in a hospital, over which he had no control, and the interne and nurses at the hospital, and it was held:

"Each, in serving with the other, is rightly held answerable for his own conduct, and as well for all the wrongful acts or omissions of the other, which he observes and lets go on without objection, or which, in the exercise of reasonable diligence, under the circumstances, he should have observed."

*Haase v. Morton & Morton, supra,* is based upon a partnership, and in *Moehlenbrock v. Parke, Davis & Co., supra,* the defendants, both seeing and knowing the cyanotic condition of the patient, continued administering ether to him when they knew it was fraught with great danger, and committed a joint trespass.

Nothing in these cases is comparable to the case at bar. If it be conceded that an injury was wrongfully inflicted upon appellee, appellant Boynton had nothing to do with it, and no witness has testified to any fact which charges him with an act of omission or

commission. Appellant Boynton received no fee; he employed neither of the other appellants in the sense that he had any direction over them. Boynton was the family physician, in a small country village, who did not even pretend to be skilled in the operation of tonsillectomy. As an act of kindness, being the family physician, appellant Boynton called up the other appellants, one of whom at a prior time had been employed by appellee's family for a similar performance upon a younger daughter; arranged the date at the hospital and went with the family and rendered them all the assistance that he could in this occurrence, and nothing that appellant Boynton did or omitted to do from the record before us warranted his being subjected to a penalty or mulcted in damages. In the opinion of this court there was no joint liability in this case.

There are numerous other assignments of error, based upon the admission and rejection of evidence, the giving of instructions and other errors occurring upon the trial, many of which do not seem to be without merit. In three instances, witnesses, who heard appellee speaking over the telephone a week after the operation, recognized and identified her voice, offered to testify that they heard appellee state that she was getting along nicely from her operation. This was in direct contradiction to appellee's testimony and her case. This testimony was objected to on the ground that no foundation had been laid for the same. This was error. To recount even a few of the other errors assigned would extend this opinion to too great length, and in the view we have taken of the case serve no useful purpose.

But it is clear from the evidence that none of the appellants unskilfully or negligently conducted themselves in the performance of the operation in question, and that there was not a want of ordinary care and skill on their part; nor did they or any one of them improperly handle the body of appellee or use great

force and violence therefor; nor did they improperly thrust back the head and neck of appellee with such force and violence and to such an extent and degree that the muscles and ligaments of the neck of appellee were injured, torn and lacerated, and the back and vertebrae of appellee dislocated, displaced, injured or fractured, as charged in the declaration. It does not appear from evidence that the neck or back of the appellee was broken, injured or dislocated during the course of the operation, nor that certain vertebrae of her spine were fractured, displaced or dislocated, nor that the appellants, or any one of them, in any manner rudely, roughly or carelessly handled the appellee.

We are therefore of the opinion that the motion made by appellants, and each of them, at the conclusion of all the evidence to direct a verdict of not guilty for the appellants should have been sustained and that it was error to refuse to direct such verdict; and for the reasons stated the judgment is reversed.

*Reversed with finding of facts.*

Finding of facts to be incorporated in the judgment: We find that the evidence in the record does not show or tend to show that the appellants were guilty of the charges of malpractice or negligence contained in the declaration.